IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 21, 2009

**GRADY WAYNE MEALER v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Marshall County**
**No. 2008CR86     Robert Crigler, Judge**

**No. M2008-02676-CCA-R3-PC - Filed July 23, 2010**

Petitioner, Grady Wayne Mealer, appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of counsel because he was denied the right to testify at trial.  After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Grady Wayne Mealer.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William Michael McCown, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I.  Background**

Following a jury trial, Petitioner was convicted of burglary and two counts of theft of property valued at more than one thousand dollars but less than ten thousand dollars, all Class D felonies.  The two theft convictions were merged, and Petitioner received an effective twelve-year sentence in the Department of Correction as a Career offender.  On appeal, this Court affirmed the convictions. *State v. Grady Wayne Mealer*, No. M2006-01978-CCA-R3-

CD, 2007 WL 2042503 (Tenn. Crim. App. July 13, 2004). The facts surrounding Petitioner's convictions were summarized by this Court on direct appeal as follows:

> George "Bill" Scott testified that he lived at 2980 Anes Station Road in Marshall County. About May 18, 2005, Scott, his wife, his daughter, and his son-in-law traveled to Macon, Georgia to attend a high school graduation. The family had planned to be gone for one week but decided to return home early. About 4:00 p.m. on May 22, the Scotts pulled into their driveway. Bill Scott's wife went inside while he sat outside to rest. He stated that he had a workshop about one hundred fifty feet from his house and that he would work on cars and other vehicles in the shop. The shop had two car bays, and each bay had a sliding door that could be raised. Scott kept hand tools, welders, cutting torches, sockets, wrenches, and grinders in the shop. He stated that the shop and its bay doors were locked when he and his family left for their trip to Georgia.
>
> Scott testified that his wife came outside and sat with him. While they were sitting outside, Scott thought he saw someone go into his shop's second car bay. He and his wife walked over to the shop and saw that one of the bay doors was raised. Scott saw the appellant, who Scott had known since the appellant was a baby, "climbing over some stuff [and] toting tool boxes." Scott asked the appellant what he was doing, and the appellant said he had come to get the tools for Bill Scott. Scott told the appellant, "I am Bill Scott. You know better than that, Grady." The appellant admitted he had lied to Scott and said, "I come to get them for my brother Cleborn. He said they was his." Scott told the appellant to put the tools back in the shop, and the appellant put the tools in the first car bay. Scott told his wife to telephone the police, and the appellant said he was not going back to jail. The appellant went to his car and opened the door. Scott stopped neighbor Jimmy Richardson, who had been driving by, and asked Richardson for help. Richardson told the appellant that the appellant was not leaving, the appellant shoved Richardson, and Richardson fell backward. The appellant jumped into his car as Scott's daughter and son-in-law pulled into the driveway.
>
> Bill Scott testified that as the appellant began to drive away, Jimmy Richardson reached into the appellant's car window, and the appellant dragged Richardson about twenty or twenty-five feet before Richardson was able to get out of the car. Scott and his daughter got into his truck and followed the appellant. Scott stated that he sometimes had to drive ninety to one hundred miles per hour to keep up with the appellant and that he chased the appellant

-2-

for ten to fifteen miles to the appellant's father's property. When the appellant got to the property, he jumped out of the car and ran into the woods. A patrol car pulled up to the property and officers shined lights into the woods, but they could not find the appellant. Scott returned home to check on his tools and discovered that the appellant had put twelve to fifteen thousand dollars worth of tools into buckets and had brought the buckets outside. He stated that over one thousand dollars worth of tools were missing, including a socket set, ratchets, three tool boxes containing tools, and grinders. He said that lamps with three large owls on them were also missing and that the lamps were later found in the trunk of the appellant's car. He stated that the appellant had entered the shop by kicking loose a piece of plywood over a trap door.

On cross-examination, Scott testified that when he and his wife returned home that afternoon, the bay doors to the shop were closed. After the appellant jumped out of his car and ran into the woods, Scott did not look into the appellant's car because the officers told him to stay back. He said he did not know if any tools were in the appellant's car.

Lorene Scott, Bill Scott's wife, testified that on the afternoon of May 22, her husband drew her attention to something, and they walked from their house to his shop. When they got to the shop, the appellant was walking out with two tool boxes in his hands. The appellant told Bill Scott, "Bill Scott sent me here to get these tools." Bill Scott told the appellant, "Well, I am Bill Scott." The appellant then said that his brother Cleborn had sent him. Bill Scott told the appellant that the tools did not belong to Cleborn, and he told his wife to "call the law." The appellant got into his car to leave, and Bill Scott stopped Jimmy Richardson for help. Richardson tried to hold the appellant, but the appellant fled, and Bill Scott and his daughter chased the appellant. Later, Bill Scott and his wife inspected the shop. They found tools piled up at the door, and it took them one or two days to put the tools back in their place.

Emma Jean Scott Pugh, Bill and Lorene Scott's daughter, testified that she lived two houses away from her parents. On May 22, Pugh and her husband dropped off the Scotts at their home, and the Pughs drove to their own home to unload their car. They then returned to the Scotts' house, and Emma Pugh saw her parents and the appellant coming out of her father's garage. Bill Scott tossed his daughter a cellular telephone and told her to call the police because the appellant was trying to rob him. The appellant tried to get into his car, which he had parked at the bottom of a hill next to the shop, but Bill Scott shut the car door and told the appellant he was not going anywhere until the police

arrived. Jimmy Richardson drove by, and Bill Scott asked him to help prevent the appellant from leaving. The appellant pushed Richardson and jumped into his car, and Richardson reached into the window to try to take the appellant's keys out of the ignition. The appellant drove away, dragging Richardson twenty-five to thirty feet. Bill Scott and his daughter got into a truck and chased the appellant to the Mealer property, where the appellant ran into the woods.

Jimmy Richardson testified that he lived about one mile from the Scotts. On May 22, 2005, he rode by the Scotts' house, and Bill Scott stopped him and said, "He's robbing me." Richardson told the appellant to stop, but the appellant started his car engine. Richardson told the appellant that "you're not leaving" and tried to grab the key out of the ignition. However, Richardson's arm got caught in the window, and the appellant dragged him "a little ways." Richardson stated that the appellant's sister lived about one and one-half miles from the Scotts.

Investigator Jimmy Oliver testified that on May 22, 2005, he was a deputy with the Marshall County Sheriff's Department and responded to a call that originated from Anes Station Road. In response to the call, Investigator Oliver drove to Farmington Belfast Road and stopped at the Mealer property. He spoke to Bill Scott, who stated that the appellant had fled into the woods. Investigator Oliver and another officer searched the property but could not find the appellant. Investigator Oliver saw "some owl lamps" in the appellant's car and talked with the appellant's sister. On cross-examination, Investigator Oliver testified that he did not see any tools in the car and that he never inventoried the car. He said Lorene Scott told him the owl lamps were hers.

Minnie Mae Myatt, the appellant's sister, testified for the appellant that on May 22, she learned about the incident between Bill Scott and the appellant and went to her father's property. When she arrived, Bill Scott and Investigator Oliver were there. Myatt's car was also there, and Investigator Oliver helped Myatt take the battery out of the car. Investigator Oliver told Myatt that he did not find anything in the car and asked Bill Scott if anything in the car belonged to Scott. Bill Scott told Investigator Oliver, "[N]o. Nothing was taken." The jury convicted the appellant of burglary and two counts of theft of property. The trial court merged the theft convictions, and the appellant agreed to an effective twelve-year sentence to be served at sixty percent.

*State v. Mealer*, 2007 WL 2042503, at *1-3.

## II. Post-Conviction Hearing

Petitioner testified that trial counsel did not visit him before trial, while he was in the Marshall County Jail, and they did not discuss the case in preparing for trial. Because he had always pled guilty, Petitioner said that he had not been through a jury trial in any of his other cases. He testified that on the day of trial, counsel told him about the State's offer and that Petitioner should accept it; however, the offer included a prison term. In a conversation that took place in the corner of the courtroom during trial, Petitioner said that he and trial counsel discussed whether he should testify, and trial counsel advised against it. Petitioner testified that trial counsel told him that if he testified, the State would bring up his past, and he would receive a longer sentence. He understood that it was trial counsel's decision as to whether he testified at trial.

Petitioner testified that he stopped at the victim's property on the day of the offenses to use the restroom in a shop located near the road. He thought that he was in the shop for ten minutes. Petitioner said that he saw the victim who accused Petitioner of "robbing him." Another man was also present, and the victim told him to call police. Petitioner testified that he panicked and fled the scene in his vehicle. He denied having any tools or property in his hand and said that nothing in the car belonged to the victim.

On cross-examination, Petitioner admitted that he had prior convictions for felony failure to appear, violation of the habitual motor offender law, fifth offense driving under the influence of an intoxicant, and burglary of a motor vehicle. He also had numerous misdemeanor convictions. Despite having twenty-two separate convictions, Petitioner said that he did not have any legal knowledge. He could not recall anyone from the public defender's office, other than trial counsel, who spoke with him about the case. Petitioner claimed that he and trial counsel spoke for about an hour to an hour and a half before trial. He said that they discussed enhancement factors, whether he should accept the State's plea offer, and he informed trial counsel that he was not guilty and that he was on the victim's property at the time of the offenses to use the restroom. He also told counsel that no lamp or tools were missing even though witnesses testified that they saw him loading the victim's tools into his car. Petitioner thought that the State's offer was "[e]ight at 45." He did not recall trial counsel explaining that is it was his choice whether to testify at trial. Petitioner acknowledged that the trial court questioned him in open court about his decision not to testify, and he told the court that he understood that it was his choice whether to testify. He also signed a document concerning his right to testify. However, he claimed that trial counsel told him what to say to the court.

-5-

Trial counsel testified that he handled the preliminary hearing and learned a "vast majority" of the case through the victim's testimony at that hearing. The victim said that he had been gone a few days on vacation, and when he arrived home, he saw Petitioner in his shop in the process of moving tools around. Petitioner initially told the victim that he had permission to be there; however, Petitioner fled the scene when he realized that he was talking to the shop's owner. Trial counsel testified that he and Petitioner discussed the case before the preliminary hearing. He said, "Mr. Mealer kept insisting that he wasn't guilty, but he didn't really tell us any sort of facts about the case." Petitioner never mentioned that he was in the shop to use the restroom and said that his sister, Minnie, would testify on his behalf. Trial counsel testified that he filed for discovery and obtained a complete list of the State's witnesses. He met with Petitioner a minimum of three or four times before trial. Public Defender Donna Hargrove also spoke with him and sent investigators out to interview witnesses. The two investigators also met with Petitioner at the jail. Trial counsel testified that he received a plea offer from the State and recommended that Petitioner accept it. He also advised Petitioner of the possible sentence that he would receive if the case went to trial.

Concerning Petitioner's testimony, trial counsel testified that his normal practice is to explain the trial process to a defendant before trial. He said, "And I will explain to them that we want to wait until after the testimony to make a decision about whether nor not they should testify. I let them know that the decision is theirs." Trial counsel testified that after Minnie Mealer testified, he met with Petitioner in a corner of the courtroom about testifying. It was at least the second conversation that he and Petitioner had about testifying. Trial Counsel said that he and Petitioner discussed the State's proof, and based on Petitioner's prior convictions, it was his recommendation that Petitioner not testify, "but it was his choice." Petitioner also signed a form concerning his right to testify. Trial counsel testified that he did not tell Petitioner what to say during the *Momon* hearing.

On cross-examination, trial counsel testified that he remembered talking to Petitioner about whether he should testify. He wanted to be clear about what he had done and "what Mr. Mealer's reasons for not testifying were" because Petitioner had brought a post-conviction petition against another attorney. Trial counsel testified that he felt Petitioner should not testify because "[a]ny time you have felonies on your record, the jury is predisposed to not believe you." He also stated that the victim was a very believable witness, and "his wife and his daughter and his son-in-law only added to that." Trial counsel felt that putting Petitioner on the stand with felonies would not help the case, "especially when he couldn't give me anything substantive as far as what his defense was." Trial counsel testified that he told Petitioner that they needed to discuss what Petitioner would say if he testified. He said that Petitioner did not ask many questions after trial counsel gave his recommendation about testifying, and he felt that Petitioner understood everything. He said that Petitioner's main concern was getting his sister to testify.

Public Defender Donna Hargrove testified that she became involved in Petitioner's case at the circuit level, and she did not receive a lot of information from him the first time that they met. She also met with him several other times at the courthouse. Ms. Hargrove testified that Petitioner said that he did not commit the offenses, but he offered no explanation as to why he was on the victim's property other than say that they were family friends. She said that Petitioner gave specifics about the "Brown" case, another case that Petitioner had pending, but he would never "speak in specifics" about the present case. Ms. Hargrove then took the names from the State's witness list and requested that investigators interview them. She also spoke with Petitioner's sister who said that one of the officers told her that he did not find anything in Petitioner's car. This contradicted the officer's testimony at the preliminary hearing. Ms. Hargrove testified that she communicated all of the information to trial counsel. She said, " We were both frustrated that he wouldn't speak to us. We didn't know what kind of defense we had going in with the Scott case. He wouldn't talk about it other than I didn't do it. We were family friends, talk to Minnie."

Marshall "Micky" Campbell, an investigator with the public defender's office, testified that he and another investigator met with Petitioner two or three times at the Marshall County Jail. Petitioner gave them a detailed explanation about everything involving Mr. Brown's car lot, but the only information that he would give about the present case was that he "didn't do it." Investigator Campbell said that Petitioner did not think that the Scott family would testify against him because of the prior family relations. He did not receive any information from Petitioner concerning a possible defense, and Petitioner did not mention anything about the restroom. Mr. Campbell spoke with the State's witnesses and confirmed that their testimony would be the same as it was at the preliminary hearing. He also spoke with Petitioner's sister and did not learn anything that would be helpful to the case.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. 40-30-210(f). The trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id*.; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed.

2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id*. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn.1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. In cases involving a guilty plea, the petitioner must show prejudice by demonstrating that, but for counsel's errors, he or she would not have pleaded guilty but would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985); *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

## IV. Knowing and Voluntary Waiver of the Right to Testify at Trial

Petitioner argues that his decision not to testify at trial was not knowing and voluntary because trial counsel failed to meet with him and was unprepared for trial. However, the record shows that Petitioner signed a waiver of his right to testify, and he was questioned extensively about the waiver at trial. At trial, Petitioner told the court that he understood that it was his choice whether to testify and that he did not want to testify. The record shows that trial counsel met with Petitioner and was prepared for trial. A preliminary hearing was held, trial counsel received discovery from the State, and he had investigators interview the witnesses. Concerning Petitioner's right to testify, trial counsel said he recommended that Petitioner not testify, but told him that it was his choice.

The post-conviction court credited the testimony of trial counsel and other member's of the public defender's office and found that Petitioner did not mention the "restroom defense" to them. The court held that Petitioner's testimony "about having to use the bathroom would not have changed the outcome of the case. In fact, it would have corroborated his presence there at the scene. The post-conviction court further noted: "It defies logic that you would go inside someone's shop to use the bathroom when you are in a rural area away from the road. It frankly makes no [sense] whatsoever." The court pointed

out that there were numerous witnesses for the State that were extremely credible, and there was no reason for them to fabricate evidence.

The court further concluded:

Frankly, I credit since he filed a post conviction against Kelly Wilson, and it appears that both Mr. Collins and the Court took extra pains to make sure the defendant understood he had a choice to testify, and also as the State pointed out on cross-examination, the defendant has had many experiences with the Court and had been exposed every time he pled guilty. Courts have advised him of his rights. The fact that Ms. Hargrove mentioned he was inquiring about getting the sentence concurrent just shows he certainly understands the legal system very well.

We conclude that Petitioner has failed to show that trial counsel's assistance fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance. Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE